**In the United States District Court
for the District of Kansas**

———————

Case No. 24-cr-40045-TC

———————

UNITED STATES OF AMERICA,

*Plaintiff*

v.

DAEQUAN JERMAINE RAYTON,

*Defendant*

———————

**MEMORANDUM AND ORDER**

Daequan J. Rayton is charged with one count of possession of a machine gun in violation of 18 U.S.C. § 922(o). Doc. 1. He moves to suppress the machine gun that law enforcement seized upon his arrest and to dismiss his indictment because Section 922(o) violates the Second Amendment. Docs. 16 & 17. For the following reasons, Rayton's motions are denied.

**I**

Rayton makes two separate requests. Each has its own standard.

**A**

**1.** Rayton first seeks to suppress a machine gun, as that term is used in Section 922(o), that police found when they searched the trunk of his car because, in his view, the search violated the Fourth Amendment. That provision protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Searches and seizures—of people, their homes, and their personal property—are presumed unreasonable when conducted without a warrant. *United States v. Karo*, 468 U.S. 705, 717 (1984). But that does not mean that every warrantless search or seizure is unreasonable. *Brigham City v. Stuart*, 547

1

U.S. 398, 403 (2006) ("[B]ecause the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions.").

In the event of a warrantless search or seizure, the Government may rebut the presumption of unreasonableness by showing that an exception to the warrant requirement applies. *Brigham City*, 547 U.S. at 403. While it is a defendant's burden to show that the Fourth Amendment is implicated, once he carries that burden, the Government must prove that the conduct in question was reasonable. *United States v. Neugin*, 958 F.3d 924, 930 (10th Cir. 2020). One way it can do so is to show that law enforcement officers had probable cause to search a vehicle without a warrant. *Collins v. Virginia*, 584 U.S. 586, 591 (2018). Vehicles' ready mobility and pervasive public highway regulations have long justified this so-called "automobile exception." *Carroll v. United States*, 267 U.S. 132, 153 (1925) (upholding a warrantless vehicle search because a "vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought"); *South Dakota v. Opperman*, 428 U.S. 364, 368 (1976) (holding that "pervasive and continuing governmental regulation" diminishes the expectation of privacy in automobiles).

The ordinary remedy for an unconstitutional seizure is suppression of the evidence. United States v. Webster, 809 F.3d 1158, 1165 (10th Cir. 2016). But the general rule is that "only the improperly seized evidence, not all the evidence, must be suppressed." *Id.* And suppression "should be a last resort, not a first impulse." *United States v. Sells*, 463 F.3d 1148, 1154 (10th Cir. 2006) (quoting *Hudson v. Michigan*, 547 U.S. 586, 591 (2006)). This is because the exclusionary rule has "substantial social costs[,] which sometimes include setting the guilty free and the dangerous at large." *Hudson*, 547 U.S. at 591. Thus, the rule is applicable "only . . . where its deterrence benefits outweigh its substantial social costs." *Id.*

**2.** Rayton also seeks to dismiss the indictment. Federal Rule of Criminal Procedure 12 generally permits pretrial resolution of motions asserting "any defense, objection, or request" that can be determined "without a trial on the merits." Fed. R. Crim. P. 12(b)(1). A defendant may move to dismiss an indictment under Rule 12(b) for several reasons, including failure to state an offense. *See* Fed. R. Crim. P. 12(b)(3)(B)(v). On such a motion, "the question is not whether the government has presented sufficient evidence to support the charge, but solely whether the allegations in the indictment, if true, are

2

sufficient to establish a violation of the charged offense." *United States v. Todd*, 446 F.3d 1062, 1068 (10th Cir. 2006) (citing *United States v. Sampson*, 371 U.S. 75, 78–79 (1962), and *United States v. Hall*, 20 F.3d 1084, 1087 (10th Cir. 1994)). If the Government is incapable, as a matter of law, of proving its case beyond reasonable doubt based on facts in the indictment or the undisputed facts, dismissal is proper. *United States v. Chavez*, 29 F.4th 1223, 1226 (10th Cir. 2022).

These rules also apply where the defendant mounts an as-applied constitutional challenge to his indictment. The challenge must not require a trial on the merits to determine the constitutional objection and the "legal adequacy of an indictment must be analyzed solely on the basis of the factual allegations contained in the indictment." *United States v. Pope*, 613 F.3d 1255, 1258 (10th Cir. 2010) (holding that a constitutional objection under 12(b) based on *District of Columbia v. Heller* could not be resolved pretrial). When facts outside the indictment or a set of agreed facts would assist in determining the validity of the defendant's claim, Rule 12 does not permit disposition before trial. *Id.* at 1259 (citing *United States v. Covington*, 395 U.S. 57, 60 (1969)). But if the challenge requires a court "to answer only pure questions of law," pretrial disposition is appropriate. *Id.* at 1260.

## B

On February 6, 2024, shots rang out north of Lake Shawnee in Topeka, Kansas. At least two people heard them. One was an anonymous 911 caller, who reported hearing gunshots at Eastgate Park, 3600 Southeast 7th Street in Topeka, Kansas.[1] The caller said that she lived across Eastgate Park and heard "a whole lot of gunfire and gun shooting," that there was "a gang of people at the park," and that she saw "a gentleman putting a bunch of guns in the back of his car." The other was Deputy Guy Gardner of the Shawnee County Sheriff's Office, who was on routine patrol nearby and testified that he heard a barrage of gunfire. Shortly after hearing that barrage, Gardner received a call from dispatch concerning the anonymous caller and responded to Eastgate Park.

Upon arrival, Gardner noticed three cars: a black Dodge Charger, a white Chevrolet Impala, and a black Nissan Maxima. The Impala and

---

[1] The following facts were found based on the witnesses' testimony at the suppression hearing.

the Maxima were parked together on the east side of the park, while the Charger was parked alone on the west side. Gardner went to the Maxima first. There was someone sitting in the driver's seat. Gardner asked the driver to roll down the window. When the driver did so, Gardner noticed a strong odor of marijuana. Gardner then asked the driver to step out of the Maxima, searched the Maxima, and found marijuana.

While Gardner was focused on the Maxima and Impala, the 911 caller phoned again. She told dispatch that police were "searching the wrong car [and] walking right past it." The dispatcher replied that she "need[ed] to know what vehicle," and the caller said the "black car by the sign." The dispatcher then asked: "Why are we searching the vehicle, what's in it?" The caller replied: "Y'all need to search that car right there for guns." The dispatcher then followed up: "Ok, what makes you think there's guns in it?" The caller then said: "I seen them put the guns in that car, in the trunk of that car."

Dispatch communicated this information to a lieutenant who was on scene, who then relayed the intel to Gardner. Gardner walked toward the Charger and, as he did so, Rayton approached him from the sidewalk. Rayton asked Gardner what he was doing. Gardner explained that he was investigating the crime of criminal discharge of a firearm, and he asked Rayton if he owned the Charger and if he had a gun. Rayton responded that the black Charger was his car and that he had a gun in the trunk, but that he had not shot it. Upon further inquiry, Gardner then learned that Rayton had an active warrant in Shawnee County and arrested him.

Gardner searched the Charger and found a pistol with an extended magazine in the trunk. The pistol was loaded with full metal jacket 5.56 rounds and did not have a serial number. Gardner asked Rayton about the serial number, who replied that the pistol was "built by buying parts and pieces." Doc. 20 at 3.[2] Gardner seized the pistol. He explained to Rayton that he did not know whether having a pistol without a serial number was legal or illegal and that he needed to check on that. When Rayton asked how he could get the pistol back, Gardner said that he

---

[2] All document citations are to the document and page number assigned in the CM/ECF system.

was not "holding it as evidence," and that Rayton could pick it up from the Sheriff's Office.

Gardner then walked the grounds of the park and found a live (not-fired) green-tipped 5.56 round. This was the same caliber as the rounds in Rayton's pistol. He asked Rayton about the green-tipped round, and Rayton said that his pistol was loaded with full metal jacket rounds rather than green-tipped rounds, and that the green-tipped round proved that he had not been shooting his pistol. Gardner then spoke with a person whose home had been shot. He discovered at least one bullet hole in the person's window and located spent 5.56 caliber shell casings in the area.

Later at the Shawnee County Sheriff's Department, Gardner disassembled and checked the pistol. During this process, he realized that the pistol was fully automatic because it allowed the hammer to fall without resetting the trigger.[3] A grand jury subsequently indicted Rayton on one count of possession of a machine gun in violation of 18 U.S.C. § 922(o). Doc. 1.

Rayton now moves to suppress the pistol and to dismiss the indictment. Docs. 16 & 17. He argues the pistol should be suppressed because Gardner lacked probable cause to search Rayton's vehicle. Doc. 16 at 4. Even if Gardner had probable cause, the pistol should still be suppressed, Rayton argues, because "any probable cause dissipated when Gardner realized the ammunition in the magazine of Rayton's firearm did not match the ammunition found in the park." *Id.* at 5. And he argues the indictment should be dismissed because Section 922(o) is unconstitutional. Doc. 17 at 1. A suppression hearing was held on February 27, 2025, and Rayton's motions are now ripe for decision.

## II

Deputy Gardner had probable cause to search Rayton's vehicle, and discovery of the green-tipped 5.56 round did not dissipate probable cause. Additionally, Rayton has not met his burden to show that

---

[3] Rayton confirmed at the hearing that he does not challenge the legality of Gardner's manipulation of the weapon nor the discovery of this functionality.

5

machine guns are in common use today for self-defense. Accordingly, Rayton's motions are denied.

### A

**1.** Rayton argues that Gardner lacked probable cause to search the Charger because "there was insufficient evidence connecting [him] to the shooting alleged by the 911 caller." Doc. 16 at 4. He stresses that the 911 caller did not describe him as the alleged shooter and that the mere fact that he admitted to possessing a firearm was not enough to give rise to probable cause. *Id.*

"Probable cause to search a vehicle is established if, under the totality of the circumstances, there is a fair probability that the car contains contraband or evidence." *United States v. Phillips*, 71 F.4th 817, 823 (10th Cir. 2023) (quoting *United States v. Vasquez-Castillo*, 258 F.3d 1207, 1212 (10th Cir. 2001)); *see also Florida v. Harris*, 568 U.S. 237, 243 (2013) ("A police officer has probable cause to conduct a search when the facts available to him would warrant a person of reasonable caution in the belief that contraband or evidence of a crime is present."). Probable cause is not a high bar. *Hinkle v. Beckham Cnty. Bd. of Cnty. Commissioners*, 962 F.3d 1204, 1220 (10th Cir. 2020) (quoting *Kaley v. United States*, 571 U.S. 320, 338 (2014)). It demands "only the kind of fair probability on which reasonable and prudent people, not legal technicians, act." *Id.* (quoting *Kaley*, 571 U.S. at 338).

Considering the totality of the circumstances, there was a fair probability that Gardner would find evidence of the crime he was investigating—criminal discharge of a firearm—in the Charger. The 911 caller reported seeing various people and cars in the park.[4] When Gardner arrived, he noticed several cars. *See United States v. Conner*, 699 F.3d 1225, 1230 (10th Cir. 2012) (endorsing an officer's reliance on a 911 call where the officer corroborated details of the call). The caller also reported that she saw someone putting guns in the trunk of the Charger and that she lived across Eastgate Park. This gave Gardner, who had also heard the barrage of shots, reason to rely on the caller's

---

[4] Rayton disclaimed challenging the reliability of the anonymous 911 calls or Gardner's reliance on the statements made by the caller. *See generally Navarette v. California*, 572 U.S. 393, 398–400 (2014) (exploring the reliability of an anonymous 911 call). That position is sound because, as noted, circumstances support the caller's reliability for probable cause.

information. *See Illinois v. Gates*, 462 U.S. 213, 234 (1083) (concluding that an informant's tip was entitled to weight when the informant claimed to have observed an incident "first-hand"); *United States v. Brown*, 496 F.3d 1070, 1077 (10th Cir. 2007) (noting that it was reasonable for officers to take a 911 caller's information seriously when they knew "that the caller's information was based on firsthand knowledge and that it was contemporaneous"); *Conner*, 699 F.3d at 1230 (quoting *United States v. Perkins*, 363 F.3d 317, 326 (4th Cir. 2004) ("Residents of neighborhoods are often in the best position to monitor activity on the streets."). That the 911 caller phoned a second time to tell the officers they were looking into the wrong vehicles for the guns and instead directing them to look in to the Charger's trunk further increased the probability that Gardner would find contraband in it.[5] *See United States v. Copening*, 506 F.3d 1241, 1247 (10th Cir. 2007) (quoting *United States v. Johnson*, 364 F.3d 1185, 1191 (10th Cir. 2004) (noting that the detailed nature of a 911 tip "significantly circumscribed the number of people police could have stopped in reliance on it"). And when Gardner asked Rayton if he had a gun, Rayton confirmed the 911 caller's tip by admitting that he had a gun and that it was in the trunk of his Charger. That was sufficient to lead a reasonable officer to believe that evidence of the crime of unlawful discharge of a firearm would be found in the trunk. *See United States v. Bradford*, 423 F.3d 1149, 1159 (10th Cir. 2005) (concluding that the totality of the circumstances gave rise to probable cause to search a car when the defendant admitted to police that she had contraband in her car).

Rayton's argument that "Gardner had no probable cause to believe evidence of the shooting would be found in Rayton's trunk because he

---

[5] Gardner did not search the trunk as a search incident to Rayton's arrest. *See United States v. Pinder*, 121 F.4th 1367, 1371 (10th Cir. 2024) (quoting *Arizona v. Gant*, 556 U.S. 332, 343 (2009)) ("[I]n the automobile context, there are only two permissible searches incident to the arrest of a recent occupant: (1) 'when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search'; and (2) 'when it is reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle.'"). Rather, an independent finding of probable cause supported that search. *See United States v. Saulsberry*, 878 F.3d 946, 951 (10th Cir. 2017) (quoting *United States v. Chavez*, 534 F.3d 1338, 1345 (10th Cir. 2008)) ("Once the officers' suspicions rise to the level of probable cause, they are empowered to search the entire vehicle, including the trunk and all containers therein that might contain contraband.").

had no probable cause to believe Rayton was shooting in the park" is misplaced. Doc. 16 at 6. While it is true that the 911 caller did not identify Rayton as the shooter, this fact alone did not defeat Gardner's probable cause to search the trunk. *See United States v. Traxler*, 477 F.3d 1243, 1247 (10th Cir. 2007) (noting that facts are not considered in isolation). Gardner had probable cause to search the Charger for evidence concerning the unlawful discharge of a firearm within the city limits even if he did not have probable cause to believe Rayton was the shooter. *See Patel v. Hall*, 849 F.3d 970, 981 (10th Cir. 2017) (quoting *Stonecipher v. Valles*, 759 F.3d 1134, 1141 (10th Cir. 2014)) ("[T]he relevant question is whether there was a substantial probability . . . that the person or *property* was involved in a crime.") (emphasis added). Based on the 911 caller's statements and Rayton's admission that his gun was in the trunk, Gardner had an objectively reasonable belief that there were guns in the Charger. *Patel*, 849 F.3d at 981 (quoting *Cortez v. McCauley*, 478 F.3d 1108, 1116 (10th Cir. 2007)) ("Probable cause exists when the facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that . . . the person or property was involved in the crime.").

**2.** Rayton argues that, even assuming Gardner had probable cause to search the Charger initially, "probable cause dissipated once Gardner discovered the magazine attached to Rayton's firearm was fully loaded with different ammunition than that located on the ground in the park." Doc. 16 at 7. Further, Rayton claims that Gardner's statement that he was not holding the pistol as evidence proves he "had no reason to believe Rayton was shooting in the park." *Id.*

Probable cause becomes stale "when new information received by the police nullifies information critical to the earlier probable cause determination . . . ." *United States v. Dalton*, 918 F.3d 1117, 1128 (10th Cir. 2019); *see also Harte v. Bd. of Commissioners of Cnty. of Johnson, Kansas*, 864 F.3d 1154, 1182 (10th Cir. 2017) ("[E]ven when law-enforcement officers obtain a proper search warrant, probable cause may dissipate before the warrant's execution, rendering the search unreasonable under the Fourth Amendment."). The question is whether a new fact nullifies a material fact that gave rise to the finding of probable cause. *Dalton*, 918 F.3d at 1128; *see Hinkle v. Beckham Cnty. Bd. of Cnty. Commissioners*, 962 F.3d 1204, 1221 (10th Cir. 2020) (quoting *Thompson v. Olson*, 798 F.2d 552, 556 (1st Cir. 1986)) (noting that in the context of false arrest, arresting officers must release a suspect only if the police discover that

8

"'the suspicion (probable cause) which forms the basis for the privilege to arrest is unfounded'").

Gardner's discovery of a live, green-tipped round did not dissipate the probable cause to believe that Rayton's pistol may have been involved in the criminal discharge violation being investigated. Gardner heard multiple gunshots, and the 911 caller reported as much. The caller stated that weapons were being loaded into a car after the shooting. And after police investigated two of the three vehicles at the scene, the individual again called to redirect the officers to Rayton's Charger. Then, when Gardner approached the vehicle, Rayton confirmed that he owned the Charger, that he had a firearm, and that it was in the trunk. That firearm contained no 5.56 green-tipped rounds. While "new facts can *negate* probable cause," *Lin v. D.C.*, 47 F.4th 828, 841 (D.C. Cir. 2022), the discovery of a green-tipped round did nothing to undermine Gardner's reason to believe the weapon found may be connected to the crime he was investigating. For example, Gardner testified—without any contrary evidence—that he has seen individuals mix-and-match different types of ammunition within their magazines.

Even if Rayton never possessed a green-tipped round, there was more than an adequate basis to suspect the firearm and/or Rayton may be connected to the criminal discharge crime being investigated. For example, Gardner found other spent 5.56 caliber rounds around the home that had been shot. And even if Gardner had found a panoply of ammunition of varying calibers all incompatible with Rayton's pistol, that would not have been enough to dissipate probable cause given the number of shots fired and the 911 caller's identification of multiple weapons being placed into the black Charger. *See Hinkle*, 962 F.3d at 1222 (citing *Romero v. Fay*, 45 F.3d 1472, 1480 n.6 (10th Cir. 1995)) (noting that "even a plausible explanation does not oblige the officer to forego arrest pending further investigation if the facts as initially discovered provide probable cause").

Rayton's retort to Gardner "that the round proved he hadn't been shooting because his firearm was loaded with different ammunition" is insufficient. *Contra* Doc. 16 at 3. A defendant's theory of his innocence does not dissipate probable cause. *Hinkle*, 962 F.3d at 1221 (citing *Romero*, 45 F.3d at 1480) ("[A] soon-to-be arrestee's bare proclamations of innocence [are not enough]."). And finally, that Gardner told Rayton that he was not holding the pistol as evidence is immaterial, for "it is beyond debate that an officer's subjective intent is irrelevant to the probable cause determination." *Mocek v. City of Albuquerque*, 813

9

F.3d 912, 929 (10th Cir. 2015) (citing *Apodaca v. City of Albuquerque*, 443 F.3d 1286, 1289 (10th Cir. 2006)).

**B**

Rayton also moves to dismiss his indictment. Doc. 17. Accepting that his pistol is a machine gun as that phrase is used in 18 U.S.C. § 922(o), he argues that dismissal is required because Section 922(o) "offends the history and tradition of the Second Amendment . . . by imposing a blanket prohibition on machineguns." *Id.* at 1. That argument fails because he has not established that the Second Amendment covers his conduct.

The Second Amendment provides that "the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. It confers an individual right to keep and bear arms, but not a right to "carry arms for *any sort* of confrontation." *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008) (emphasis in original). Rather, "the Second Amendment protects only the carrying of weapons that are those 'in common use at the time,' as opposed to those that 'are highly unusual in society at large.'" *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 47 (2022) (quoting *Heller*, 554 U.S. at 627). To justify a firearm regulation, the Government must "demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 17. The analysis involves ascertaining whether a regulation is "relevantly similar to laws that our tradition is understood to permit, applying faithfully the balance struck by the founding generation to modern circumstances." *United States v. Rahimi*, 602 U.S. 680, 692 (2024).

When assessing whether a law offends the Second Amendment, the Supreme Court directs that courts apply a two-step analysis. The first step requires an individual to demonstrate "that the Second Amendment's plain text covers either the conduct they engaged or intended to engage in." *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 113 (10th Cir. 2024); *see also United States v. Moore*, 111 F.4th 266, 269 (3rd Cir. 2024) (applying this standard in the criminal context); *United States v. Contreras*, 125 F.4th 725, 729 (5th Cir. 2025) (same). The Second Amendment applies if the individual "is 'part of the people whom the Second Amendment protects,'" the item at issue "is an 'arm' that is 'in common use today for self-defense,'" and the "'proposed course of conduct' falls within the Second Amendment." *Rocky Mountain*, 121 F.4th at 114 (quoting *United States v. Alaniz*, 69 F.4th 1124, 1128 (9th

Cir. 2023)). If the individual meets his or her burden, the court proceeds to step two. *Id.*

At step two, the Government bears "the burden . . . to justify its regulation by demonstrating that it is 'consistent with the *principles* that underpin our' Nation's historical tradition of firearm regulation." *Rocky Mountain*, 121 F.4th at 113 (quoting *Rahimi*, 602 U.S. at 692) (emphasis in original). If the Government satisfies this burden, then "a court may conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.* (quoting *Bruen*, 597 U.S. at 17). The challenged regulation need not "precisely match its historical precursors." *Rahimi*, 602 U.S. at 681. It must "comport with the principles underlying the Second Amendment, but it need not be a 'dead ringer' or a 'historical twin.'" *Id.* Rather, the regulation's historical analogues must be "sufficiently similar to place [it] in our historical tradition." *Id.* at 700.

Rayton has not met his burden of establishing that the Second Amendment applies to his possession of a machine gun. In particular, he has not shown that the machine gun is an arm in common use today for self-defense. Several circuit courts have found that machine guns are not in common use because they are dangerous and unusual. *United States v. Fincher*, 538 F.3d 868, 874 (8th Cir. 2008) ("Machine guns are not in common use by law-abiding citizens for lawful purposes and therefore fall within the category of dangerous and unusual weapons that the government can prohibit for individual use."); *United States v. One (1) Palmetto State Armory PA-15 Machinegun Receiver/Frame*, 822 F.3d 136, 142 (3rd Cir. 2016) ("[W]e repeat today that the Second Amendment does not protect the possession of machine guns."); *Hollis v. Lynch*, 827 F.3d 436, 451 (5th Cir. 2016) ("Machineguns are dangerous and unusual and therefore not in common use."); *United States v. Henry*, 688 F.3d 637, 640 (9th Cir. 2012) (quoting *Heller*, 554 U.S. at 625–27) ("In short, machine guns are highly 'dangerous and unusual weapons' that are not 'typically possessed by law-abiding citizens for lawful purposes.'"); *Hamblen v. United States*, 591 F.3d 471, 474 (6th Cir. 2009) (quoting *Heller*, 554 U.S. at 623–25) ("[Defendant's] challenge to his conviction for unlawful possession of unregistered machine guns has been directly foreclosed by the Supreme Court, which specifically instructed in *Heller* that 'the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes.'"). Indeed, the Court suggested in *Heller* that it would be

"startling" to conclude that Section 922(o) is unconstitutional. *Heller*, 554 U.S. at 624.

Each of those cases preceded *Bruen* and *Rahimi*. Yet there is nothing within either case to suggest a different result. And federal courts have continued to apply that conclusion to machine guns. *See United States v. Jones-Lusk*, No. 24-428, 2025 WL 44141, at *2 (W.D. Okla. Jan. 7, 2025); *see also DeWilde v. Attorney General of the United States*, No. 24-84, 2024 WL 4643681, at *6 (D. Wyo. Oct. 16, 2024) (citing cases that collected similar federal court decisions on the issue). Indeed, Rayton conceded at the hearing that he did not believe either *Bruen* or *Rahimi* suggested a different conclusion.

Rayton does not meaningfully argue against the conclusion that he failed to satisfy the first step of the *Bruen* analysis. Instead, he spends most of his argument asserting that the Government has failed to establish that Section 922(o) is consistent with history and tradition. Doc. 17 at 5. But that burden never passes to the Government under *Bruen* because Rayton must first establish that the Second Amendment applies to his possession of a machine gun. *See Rocky Mountain*, 121 F.4th at 113 (10th Cir. 2024) (quoting *Rahimi*, 602 U.S. at 692). He has not done so, and that is the end of the inquiry. *Jones-Lusk*, 2025 WL 44141 at *2 (declining to reach step two because the defendant failed to satisfy step one).

Rayton further argues that "[a] fully automatic handgun is obviously an 'arm' that can be used in self-defense." Doc. 17 at 7 (citing *Heller*, 554 U.S. at 581). He posits: "[W]hat better 'arm' to use for self-defense? It would be a perverse reading of the Second Amendment's right to bear 'arms' for self-defense to exclude from protection the 'arms' that most effectively defend us from others." *Id.* The question is not a machine gun's efficacy but whether it is in common use. *Rocky Mountain*, 121 F.4th at 113; *see also Heller*, 554 U.S. at 627 ("It may be objected that if weapons that are most useful in military service—M-16 rifles and the like—*may be banned*, then the Second Amendment right is completely detached from the prefatory clause.") (emphasis added); *Hanson v. District of Columbia*, 120 F.4th 223, 233 (D.C. Cir. 2024) ("[S]ome weapons that are most useful in military service do not receive Second Amendment protection."); *Bevis v. City of Naperville, Illinois*, 85 F.4th 1175, 1197 (7th Cir. 2023) ("[W]e are not persuaded that the AR-15 is materially different from the M16. *Heller* informs us that the latter weapon is not protected by the Second Amendment, and therefore may be regulated or banned. Because it is indistinguishable

12

from that machinegun, the AR-15 may be treated in the same manner without offending the Second Amendment."). As noted, Rayton has failed to establish that it is.

Rayton cites two cases that have found Section 922(o) is unconstitutional, *United States v. Brown*, No. 23-123, 2025 WL 429985 (S.D. Miss. Jan. 29, 2025), and *United States v. Morgan*, No. 23-10047, 2024 WL 3936767 (D. Kan. Aug. 26, 2024). Neither decision aids Rayton's position. For one, "[a] decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case." *Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011). And more importantly, it appears that the holding in each of those cases was based on the Government's failure to meet its step-two burden to show that Section 922(o) is consistent with American history and tradition. *See Morgan*, 2024 WL 3936767, at *5 (noting that the Government had failed to satisfy its burden but reserving whether it may be able to carry that burden in a subsequent case); *Brown*, 2025 WL 429985, at *6–7 (criticizing the historical inquiry, sustaining the as-applied challenge under it, and reserving whether the Government in another case may be able to sustain the regulation); *see also United States v. Jones-Lusk*, No. 24-428, 2025 WL 44141, at *2 (W.D. Okla. Jan. 7, 2025) (rejecting a Section 922(o) challenge under first step of *Bruen* and noting that *Morgan* was decided before the Tenth Circuit's decision in *Rocky Mountain*). Neither case aids Rayton because he has not shown that the Second Amendment's plain text covers his possession of a machine gun. As a result, the burden never shifts to the Government to satisfy the second step of the *Bruen* test.

### III

For the foregoing reasons, Rayton's Motion to Suppress, Doc. 16, and Motion to Dismiss, Doc. 17, are DENIED.

It is so ordered.

Date: March 25, 2025                       s/ Toby Crouse
                                           Toby Crouse
                                           United States District Judge

13